**PIEDMONT FEDERAL SAVINGS & LOAN ASSOCIATION, Appellant,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, Appellee.**

**No. 8526.**

United States Court of Appeals Fourth Circuit.

Argued March 26, 1962.

Decided Aug. 15, 1962.

Franklin P. Shaw, Arlington, Va., and Stanley A. Owens, Manassas, Va., for appellant.

Charles H. Duff, Arlington, Va. (Norman F. Slenker, Arlington, Va., and Duff, Luther & Slenker on brief), for appellee.

Before SOPER and HAYNSWORTH, Circuit Judges, and FIELD, District Judge.

HAYNSWORTH, Circuit Judge.

The question is whether the savings & loan association suffered a loss by reason of forgeries of endorsements upon certain of its checks, within the meaning of an indemnity bond, or whether its loss was due to the failure of its security, as the District Court held.

Mary Thompson Miller and her husband purchased two residential lots in

Fairfax County, Virginia. They paid no cash to their grantor, but gave him notes for the purchase price and deeds of trust to secure their payment. On March 3, 1955, Mr. and Mrs. Miller gave to the plaintiff savings & loan association two notes, each in the face amount of $11,330, and each of which was secured by a deed of trust covering one of the two lots they had purchased. The Miller notes were endorsed by J. T. Moton, and William Moton, apparently the principals of J. T. Moton Realty, Inc., which soon thereafter acquired the lots from the Millers, and by Robert Fraser, a professional housebuilder. It was the intention of the parties that Fraser would build a house on each of the lots for the Millers. The loans from Piedmont Federal Savings & Loan Association were to provide the funds with which to finance the construction costs.

On January 31, 1956, no funds had been disbursed by the savings & loan association against the Miller notes. On that date, the Millers deeded the two lots to J. T. Moton Realty, Inc., subject to first deeds of trust held by the savings & loan association and second deeds of trust held by the Millers' grantor. On August 23, 1956, J. T. Moton Realty, Inc. conveyed the same two lots subject to the liens of the deeds of trust, to Robert G. and Edna M. Fraser. Robert G. Fraser was the same building contractor who had endorsed the Miller notes.

After the Millers had conveyed the lots to Moton but before Moton had conveyed them to Fraser, on May 15, 1956, the savings & loan association issued a check payable to Mary Thompson Miller and Robert G. Fraser for $2200. This check was endorsed by Mrs. Miller and Fraser. Thereafter, during May and June of 1956, the savings & loan association issued six similar checks aggregating $15,400. Apparently, the checks were delivered to Fraser. He endorsed them in his own name and in Mrs. Mil-

ler's name. The parties agree that Fraser had no authority from Mrs. Miller to endorse these checks in her name, and his action in doing so is conceded to have been forgery. Each of these six checks was paid in due course by the drawee bank and charged to the account of the savings & loan association.

On August 14, 1956, the savings & loan association received a letter from an attorney representing Mrs. Miller. He reported that, shortly after the Millers had delivered their notes and deeds of trust to the savings & loan association, the Millers had conveyed the two lots to J. T. Moton Realty, Inc., which had assumed the Millers' obligations. The attorney further reported that the Millers had not constructed any house upon either lot, that Mrs. Miller had endorsed only one check of the savings & loan association, and that they had been informed by a Mr. Russell[1] that they had no further liability in connection with the matter. The attorney's letter was concluded with a request for information about the loans, whether the Miller notes were endorsed by Moton, and what, if any, checks had been issued payable to Mrs. Miller, and information as to their endorsement. On the same day, the savings & loan association responded to the attorney advising him that the Miller notes were endorsed by J. T. Moton, William Moton and Robert Fraser, that it had issued seven checks, payable jointly to Mrs. Miller and Fraser, six of which it had received back from the drawee bank, and those six checks bore the endorsements of Mrs. Miller and Mr. Fraser.

On the next day, August 15, 1956, Fraser and his wife applied to the savings & loan association for two loans of $14,500 each to be secured by deeds of trust on the Miller lots. This application was approved on August 21. On August 23, as we have noted, the lots were conveyed by Moton to the Frasers, and, on the next day, the 24th, the approved loans to the Frasers were closed.

---

1. On the plaintiff's letterhead, a Mr. Russell is listed as its 2nd Vice President.

In closing the Fraser loans, aggregating $29,000, the savings & loan association took credit for the balances of $11,471.63 and $11,473.54 due on the Miller loans.[2] The Miller notes were marked paid and their deeds of trust were released and canceled.

In the record are facsimiles of the savings & loan association's ledger sheets upon which it recorded the balance due it on the Miller loans, interest and other charges and payments received. These disclose that, at some time, the names of the Millers and their address had been stricken from these ledger sheets and the names and address of the Frasers had been substituted.

In August 1956, Fraser had completed neither of the two houses. He was unable to complete them thereafter. It was stipulated that he had misapplied some or all of the moneys advanced to him for their construction. He suffered materialmen's liens to be filed against them and failed to make required payments to the savings & loan association. He then conveyed the two lots to a trustee for the benefit of the savings & loan association and the lienors.

The savings & loan association and the principal lien creditor agreed to complete the two houses for their joint account and to share proportionately the loss. This they did. After completion the two houses were sold, one for $22,500 and the other for $19,250. The combined claims of the savings & loan association and the lien creditor, to which was added the cost of completing the houses and sales and other expenses exceeded the net proceeds of sale. The savings & loan association suffered a net overall loss on one house and lot of $1,930.45 and on the other of $9,475.37, a total loss on the two transactions of $11,405.82.

Perhaps essential to the central theory of the savings & loan association is the fact that it seeks recovery not of its realized loss of $11,405.82 but of $15,400, the aggregate face amount of the six checks upon which Mrs. Miller's endorsement had been forged. It suffered a loss, it says, in the amount of the checks when the drawee bank paid them and charged them to its account. It regards as irrelevancies its later transaction with Fraser and its realizations out of its sale of the houses and lots. It concedes that had the bank, promptly notified of the forged endorsements, credited its account with the amount of the checks, it might be denied recovery on the theory of unjust enrichment, but it contends its collateral recoveries on its loans are unrelated to its loss. Any claim against the drawee bank having become barred by limitations,[3] it claims its loss is irrefutably established as $15,400, a loss which is legally unaffected and undiminished by any collections it may have been able to effect out of the Millers, the Frasers or its security interest in the houses and lots.[4]

This strained theory is insupportable.

The bond in suit is not a guaranty that no check bearing a forged endorsement will be charged to the account of the savings & loan association. It is

2. These balances were composed, in each instance, of the principal sum of $11,330 and interest for the period August 1 to September 18 (19th with respect to one loan). Interest charges accrued on June 30 and July 31 had been previously paid by some one, obviously not the Millers.

3. By § 6-75, Code of Virginia, 1950, a bank may not be held liable to its depositor for a payment on a forged endorsement if the depositor has given the bank no notice of the forgery within two years of his receipt of the canceled check. The savings & loan association gave the drawee bank no such notice. It says its correspondence with Mrs. Miller's attorney in August 1956 did not inform it of the forgeries and that it did not learn of them until October 1958, more than two years after it had received the canceled checks from the bank.

4. Had Fraser been financially solvent, had he promptly paid his notes to the savings & loan association, so that it suffered no actual loss, the savings & loan association, in its view, would still be entitled to recover on the bond the technical loss it incurred when the bank charged to its account the amount of each check bearing a forged endorsement.

an indemnity contract.[5] The bond obligates the defendant "to indemnify and hold harmless" the savings & loan association " * * * from and against * * any loss through forgery * * *." The agreement contemplates protection against financial loss from the covered risks, not gain or profit because of some technical or hypothetical deprivation.

█ When an indemnitor pays a claim, it is usually entitled to subrogation to any rights the indemnitee may have to recoup the loss, in whole or in part, from others. The bond in suit contains express provisions for such recoveries in section 6. The indemnitee may not have full indemnity and the additional benefit of rights to recover the same loss from third persons. Had the savings & loan association made a timely claim against the bank, it could not have required the bank to credit its account with the $15,400 without giving the bank the benefit of those rights it had, with respect to the six checks, against the Millers, the Frasers and the houses and lots.[6] It could not recover from its bonding company the full amount of the $15,400 without assigning to the surety its claims against the bank and those other claims to which the bank would have been entitled had it restored the credit.

In short, all of these transactions are interrelated. They are all in the same bundle. There has been but one loss. There was no unrecovered loss in the face amount of the six checks and an unrelated gain for the fortuitous enrichment of the indemnitee. The amount and the cause of the loss must be determined in the light of all of the related transactions.

█ There remains the question whether the conceded loss of $11,405.82 was the result of the forgery of the endorsements or of the nonpayment of the loan and the failure of the security. If caused by the forgery, the loss is within the agreement; if not, as the District Court found, the loss is not covered by the bond.

If the Millers were financially responsible and had denied any obligation to repay the $15,400 because Mrs. Miller did not receive the six checks and if the savings & loan association thereby suffered a loss, the loss would have been within the terms of the bond. That is not the case, however. The Miller notes were paid when the Fraser loan was closed. Under some circumstances, such payment, as an incident of refinancing, might not isolate the effect of the forgery, but here we think it did. We reach the conclusion upon a consideration of the causal relation between the forgery and the loss in the light of all of the circumstances.

When the Miller loans were approved, the savings & loan association must have placed little reliance upon the Millers' credit. The Millers had paid nothing for the lots and had no equity in them. Their notes were endorsed by the Motons and by Fraser. Checks for advances were made jointly payable to Mrs. Miller and to the housebuilder, Fraser. Nonreliance upon the Millers' credit is clearly indicated by the readiness with which the savings & loan association released the Millers when it renegotiated the loans, in larger amounts, with Fraser.

The security for the loans was the lots, for the deeds of trust for their purchase price had been made subordinate to the interest of the savings & loan association, and the houses to be constructed by Fraser. Fraser was made a joint payee of the checks to give assurance that their proceeds would come into his hands for use in constructing the houses.

Mrs. Miller was made a payee of the checks and her endorsement on them was required for two possible reasons. She, with her husband, was the owner of the lots and the maker of the notes. Her endorsement of checks for advances would

---

5. See Aetna Casualty & Surety Co. v. Phoenix National Bank, 285 U.S. 209, 52 S.Ct. 329, 76 L.Ed. 709.

6. See Aetna Casualty & Surety Co. v. Phoenix National Bank, 285 U.S. 209, 52 S.Ct. 329, 76 L.Ed. 709.

obviate any contention by the Millers that they had not received the proceeds of the loans. Additionally, it may be thought in such situations that the owner of the lots and principal obligor on the notes will exercise a general supervision over the housebuilder so that checks for advances are neither requested nor endorsed if construction progress obviously lags behind the advances.

As to the first possibility of value to the savings & loan association in Mrs. Miller's endorsements, the matter is clearly academic. Save for the report to the bank through their attorney in August 1956, the Millers have not denied their obligations on their notes. The savings & loan association did not accept the attorney's letter as an indication that Mrs. Miller would deny receipt of the checks and liability on her notes. It stoutly insists here that it then had no reason to doubt that Mrs. Miller had endorsed all of the checks. Nevertheless, believing that it had Mrs. Miller's endorsements, it paid the Miller notes out of the proceeds of the Fraser loans. Under these circumstances, any question of enforceability of the Millers' obligations was rendered moot by their discharge. Mrs. Miller's endorsements could have had no value to the savings & loan association as an aid to avoidance of the mooted question.

As to the second facet of the association's legitimate expectations of Mrs. Miller, it is clear that she exercised no supervisory restraint upon Fraser. This, however, the savings & loan association well knew when it renegotiated the loans with Fraser. If, as the association claims, the letter of Mrs. Miller's attorney was insufficient to bring home to it the fact that Fraser had forged Mrs. Miller's endorsements, or some of them,

it clearly informed the association that the Millers had conveyed the lots before construction of the houses began and that they had been informed they had no responsibility in the matter. The association knew that the Millers had long since ceased to be the owners of the lots and that it could not depend upon their interest as owners as a probable restraint upon Fraser's conduct in the performance of his construction work. Knowing all of this, the association released the Millers and extended additional credit to Fraser. It cannot now be heard to say it suffered loss by dependence upon Mrs. Miller's supervision of Fraser, when, knowing there had been none, it released the Millers and extended additional credit to Fraser.[7]

Fraser's forgeries of Mrs. Miller's endorsements did not subject the savings & loan association to the necessity of duplicating disbursements to Mrs. Miller. The proceeds of the checks reached the hands of the person, the housebuilder, for whom they were intended. His financial difficulties, his diversion of funds, impaired the value of the security. The impairment would have occurred though Fraser had obtained Mrs. Miller's endorsements or her subsequent ratification of his endorsements of her name.

The relation of the forgery to the loss is, at most, oblique. When the association discharged the Millers, closed new loans with Fraser and paid the junior lienholder, knowing that Mrs. Miller had exercised no supervision of Fraser, it clearly attributed no worth to Mrs. Miller's purported endorsements. It does not now attempt to show any practical worth in her endorsements, and thus places principal reliance upon the hypothetical loss immediately incurred when

7. It might be said that the savings & loan association might not have dealt so liberally with Fraser if it had realized he was a forger. This may be, but its failure of realization is not attributable to Mrs. Miller or to her failure to endorse the association's checks.

Interestingly, most of the fresh money advanced by the association when the Fraser loans were closed, did not go to Fraser. It was used to discharge the junior deeds of trust held by the Millers' grantor. The Association's payment of $5,950.68 to its junior lienholder emphasizes its confidence in, and reliance upon, Fraser. Had it not paid these junior notes, its realized loss would have been that much less.

the bank charged its account with the amount of the six checks.

The District Court was warranted in finding that the loss was caused by Fraser's insolvency and a failure of the security, not by the forgeries.

Affirmed.